# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **JANE S. GREEN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | CIVIL ACTION NO. |
| | § | 1:20-cv-05016-SCJ-LTW |
| **MAGELLAN HEALTH, INC.** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

There are genuine issues of material fact that preclude summary judgment. Plaintiff will show that the evidence and facts do not support judgment as a matter of law:

## I.    INTRODUCTION

Ms. Green asserts claims under the FMLA for interference and retaliation. Ms. Green also brings a claim for ERISA interference.[1]

There is a plethora of evidence, both direct and circumstantial that, when viewed as a whole, is strong evidence of FMLA interference and retaliation. There are stunning examples of statements made by her supervisors, and an effort to

---

[1] Plaintiff previously withdrew an age discrimination claim. Plaintiff also hereby withdraws her ERISA retaliation claim.

create a pretext for unlawful discrimination under the FMLA. Ms. Green wished only to take her FMLA and short-term disability and return refreshed, healthy, and able to do her job. Her supervisor even testified that had she not taken FMLA leave, and her performance improved, she would not have been fired. (Vadgama Dep. 31:16-21). Ms. Green had a lawful right to return to her job after FMLA leave and be given the same opportunity to show improvement that she would have enjoyed if she had not taken leave. Instead, Ms. Green was terminated for taking FMLA.

## II. FACTS AND ISSUES FOR THE JURY

Green worked at Magellan for 21 years without ever taking a sick day before her FMLA leave. (Ex. A ¶ 3). Her record was near-spotless. (*Id.* ¶ 5). On August 22, 2019, Ms. Green took FMLA leave for depression, anxiety, stress, and illness, largely related to the treatment she received from her supervisors. (Ex. E FMLA Request).

In early October 2018, Ms. Green's husband of 40 years was diagnosed with a terminal illness. (Ex. A ¶ 2). Two weeks later, her supervisors gave her a verbal warning for her performance. All the performance issues that Magellan disciplined Ms. Green for occurred after her husband became ill.

Also in October, another member of the Autism Team made a complaint about the supervisors, Jennifer Cassidy and Yagnesh Vadgama. (Ex. P HR Complaint Docs.). Ms. Green was interviewed by HR. (*Id.*) Cassidy wrongly believed that Ms. Green had made the complaint. (Cassidy Dep. 36:10 – 37:25). Following this, Ms. Green began being targeted for alleged performance issues.

In February 2019, Ms. Green received a performance warning. After the

warning, Ms. Green was given six months to show improvement per Magellan policy after a Performance Improvement Plan is provided to an employee. (Ex. O Magellan Performance Counseling Guide). During those six months, Ms. Green did not receive negative reviews. (Ex. A ¶ 7).

Also in February 2019, Ms. Green applied for intermittent FMLA for her husband's illness. (Ex. A ¶ 6; Ex. Q FMLA request for husband's illness). During the next six months, and in violation of Magellan's policy, Ms. Green's supervisor Jennifer Cassidy, began tracking the time that Ms. Green took paid time off ("PTO"), and attempted to classify it as FMLA leave without Ms. Green's knowledge. (Ex. N Cassidy's FMLA tracking; Cassidy Dep. 80:4-14; 121:22 – 122:9). She tracked this time using a handwritten calendar. (*Id.*). Later, when Ms. Green took FMLA for her illness, Cassidy contacted HR to have Ms. Green's FMLA eligibility reduced using her calendar. (*Id.*; Steele Dep. 11:11-21). This was a violation of Magellan's policy. (Zapogna-30(b)(6) Dep. 20:9-12). Whether Cassidy succeeded in denying Ms. Green's leave is not the relevant inquiry: the question for the jury is whether this is evidence of Cassidy's hostility towards Ms. Green's FMLA leave and whether these actions exhibit a desire by Cassidy to prevent Ms. Green from enjoying her full entitlement to FMLA.

During this period, evidence shows that Ms. Green's supervisors, Yagnesh Vadgama and Jennifer Cassidy, were openly hostile to her FMLA leave. Vadgama was the ultimate decision-maker for termination.

In one example of discriminatory animus, during a text conversation on

August 14, 2019, the day before the improvement plan was issued, the following

colloquy took place:

> Cassidy: Jane is taking a ½ day tomorrow
> Cassidy: OMG
> …
> Vadgama: Damn…
> Vadgama: FMLA for the ½ day?
> Cassidy: yes
> Cassidy: in the morning
> Vadgama: OK. I'm hoping HR gets back to us ASAP

(Ex. D).

As is evident from the exchange, Ms. Green's supervisors were hostile toward

her FMLA. And the final remark shows that her supervisors were hoping HR would

"get back to [them] ASAP" and approve discipline so they could terminate Ms. Green

for her FMLA. This is direct evidence of hostility towards FMLA and an intent to

discriminate on that basis. At the very least, a jury should be permitted to hear this

evidence and draw common-sense conclusions.

On August 15, 2019, Ms. Green's supervisors gave her a final Performance

Improvement Plan. The next week, Ms. Green's colleague who assisted her was out

on PTO, and Cassidy, who could have assisted Ms. Green with the extra work, was

on vacation in Las Vegas. This resulted in Ms. Green, who averaged 80

authorizations in a month, having to handle 52 authorizations in a single week,

without any assistance. (Ex. A ¶8). When Ms. Green requested assistance from

Vadgama that week, he assigned her more work. (*Id.*). A jury could decide whether

Vadgama did this because Ms. Green was on FMLA for her husband's illness,

especially when viewed alongside his other statements, particularly the comments made the day before.

Magellan policy states that after a Performance Improvement Plan is issued to an employee, the employee must be "given a reasonable period to improve." The policy also states that "you should provide a reasonable timeframe to expect improvement…" (Ex. O).  Ms. Green was given less than 5 days. A jury may find that this was not a reasonable timeframe to expect improvement, especially in light of the workload she was given.

Ms. Green's FMLA leave for her illness began on August 22, 2019. On September 9, 2019, the day Ms. Green's FMLA was approved, Cassidy sent Vadgama an email notifying him of the decision. Vadgama's response:

> "Wow – this is a game changer, right?"

(Ex. I).

Here, again, Vadgama is expressing an opinion about Ms. Green's FMLA leave. A jury may determine that he is satisfied that Ms. Green will not need to be allowed to return to work and improve her performance. Instead, the supervisors can attempt to find a reason for Ms. Green's immediate termination. At the least, a jury should be permitted to make this inference. Making this possibility even stronger, is Vadgama's testimony that, if Ms. Green had not taken FMLA and her performance had improved, she would not have been terminated. (Vadgama Dep. 31:16-21). This testimony is nearly dispositive of the issue: Ms. Green should have been treated the same as she would have been if FMLA had not been taken. But she

was not given the same opportunity.

There is additional evidence that Vadgama did not believe that Ms. Green had an illness for which she deserved FMLA. On September 4th, Vadgama commented, "Jane played the system and went on FMLA + disability…" (Ex. H). This comment is objective evidence of hostility towards Ms. Green's FMLA leave. A jury should be permitted to draw common-sense inferences about Vadgama's belief that Ms. Green was "play[ing] the system" which a jury could believe is evidence of discriminatory animus.

The evidence shows that just after Ms. Green's FMLA was approved, Vadgama sends Cassidy on a mission to find grounds to terminate Ms. Green. Cassidy later emails Vadgama with the alleged grounds for termination. Vadgama replies:

> "Fantastic work, Jen. Truly. We have grounds for termination. Now just need to sort through his FMLA situation."

(Ex. F).

The alleged grounds for termination that Cassidy develops are pretextual. For example, Ms. Green was terminated due to not returning 20 voicemails between August 15 and 22. Cassidy determines this simply because the voicemails are not deleted. In other words, to Cassidy, a voicemail that is not deleted has not been returned. Cassidy, however, knew that Ms. Green did not erase her voicemails, even though they were returned. (Ex. A Green Decl. ¶ 11). Cassidy claimed that she had Leslie Cotney return the voicemails and that Leslie told her that none of them had

been returned. (Cassidy Dep. 85:5-11). Leslie, however, says this is simply false. (Ex. B Cotney Decl. ¶ 5). Here again, a jury should be permitted to consider Cassidy's testimony and Cotney's response.

There is no evidence to support the contention that, had Ms. Green not taken FMLA leave, she would have been fired on August 23rd, which is the position she was placed into the day she returned from leave. (See Vadgama Dep. 31:16-21).

The other grounds for termination had to do with faxes that were not authorized and that were placed into a deleted folder. (Cassidy Dep. 116:21 – 118:13). But Ms. Green is sure that she did not improperly delete items. (Ex. A ¶ 12-13). If true, this would be the first time Ms. Green had ever done that. Moreover, the "deleted" faxes are in a general mailbox that is accessible by any member of the Autism Team. Thus, there is simply no evidence that Ms. Green deleted faxes or emails.

There is also a possibility that Ms. Green's email account was accessed. If true, an individual could have acted to set up grounds for termination. Cassidy testified that she had never tried to gain access to Ms. Green's email account. (Cassidy Dep. 47:5-13). This, however, is false. On September 3, 2019, Cassidy sent an email asking "how [she can] request access to Jane Green's email?" (Ex. G). If this was an innocent attempt to access an employee's email, why provide disingenuous testimony? A jury should be permitted to hear the evidence and decide.

Ms. Green was given short-term disability ("STD") through the end of

November. On November 15, an HR rep from Magellan, Kazia Steele, called Ms. Green and told her that if she did not return to work the following Monday, she would be terminated for job abandonment. (Ex. A ¶¶ 14-15). Ms. Green described Steele's affectation as "anxious," "worried," and "frazzled," as though there was something out of the ordinary taking place. (*Id.*). Ms. Steele knew Ms. Green was approved for STD through late November yet made no mention of it, despite Ms. Green requesting information. (*Id.*; Ex. J). Perhaps the worst part of this phone call was that Steele knew that Ms. Green would be terminated the day she returned. (Ex. R). Nonetheless, Steele led her to believe she had to return to work if she wanted to keep her job. (Ex. A ¶¶ 14-15). Steele also knew that, by returning, Ms. Green would have to forgo any remaining disability she would have been entitled to. Nor did Steele notify Ms. Green that Magellan's policy states she would have stayed on Magellan's payroll if she continued STD.

After speaking to Steele, Ms. Green immediately called her therapist and asked for authorization to return to work. (Ex. A ¶ 16; Ex. C ¶¶ 4-5). Hanson-Kahn wanted her to wait to return to work after her STD, but decided to allow Ms. Green to return to work, since losing her job would result in greater psychological harm. (Ex. C ¶ 6).

Ms. Green appeared for work on November 18th. That morning, Cassidy told her to complete the online training that she had missed. A few hours later, Cassidy and Vadgama terminated Ms. Green. (Ex. A ¶ 18). Cassidy emailed a termination letter to Ms. Green. (Ex. K). The letter purports to set forth the reasons Ms. Green

was terminated. The letter only contains "facts" that contributed to Ms. Green's termination. (*Id.*). Among those reasons is the statement, "On August 22, 2019 you went on continuous FMLA leave." (*Id.*). While Defendant may claim this is included as merely a fact, there are no other naked "facts" in the letter; only purported reasons for Ms. Green's termination. A jury should be permitted to decide whether the inclusion of this language is evidence of FMLA discrimination.

Cassidy also emailed the staff after Ms. Green's termination and gave a different explanation. In the email, Cassidy implies that Ms. Green was fired because "the team is fully staffed." (Ex. L). If during the leave the team became fully staffed, as Cassidy claims, then Ms. Green should have been placed in a similar position within Magellan. Magellan's varying reasons for Ms. Green's termination are evidence of pretext and discriminatory animus.

## III.   ARGUMENT AND CITATION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In viewing the evidence, the court must draw all reasonable inferences in favor of the non-moving party." *Martin v. Brevard Cty. Pub. Schs.*, 543 F.3d 1261, 1265 (11th Cir. 2008). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.   FAMILY MEDICAL LEAVE ACT - 29 U.S.C. § 2601 *et seq.*

The FMLA permits an employee to take up to twelve weeks of leave in one year for specified reasons, including the serious health condition of a spouse or the employee's own serious health condition. 29 U.S.C. § 2612(a)(1). The FMLA prohibits an employer from interfering with an employee's rights under the FMLA and from retaliating against employees for exercising their rights under the FMLA. *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).

### i.   Defendant Interfered with Plaintiff's Right to Reinstatement

"To prove FMLA interference, an employee must demonstrate that [she] was denied a benefit to which [she] was entitled under the FMLA." *Martin*, 543 F.3d at 1267. An employee need not allege that his employer intended to deny the right; the employer's motives are irrelevant." *Strickland* at 1208. An employee has the right following FMLA leave to be restored by the employer to the position of employment held by the employee when the leave began or to an equivalent position. *Martin* at 1267. To establish an interference claim, an employee need only demonstrate by a preponderance of the evidence that she was entitled to reinstatement. *Strickland* at 1206-07.  The employer bears the burden of proof to show that the employee would have been laid off during the FMLA period and is not entitled to restoration. *Id.* (citing *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 n.1 (11th Cir. 2000)). Courts have recognized that the termination of an employee upon return from FMLA leave and, by extension, the failure to "reinstate [the employee] to her former

position as required by the FMLA" is "a classic interference case." *Whitman v. Proconex, Inc.,* Civ. Action No. 08-2667, 2009 U.S. Dist. LEXIS 4016, 2009 WL141847, at *18 (E.D.Pa. Jan. 20, 2009).

On August 15, Magellan presented Ms. Green with a "Performance Improvement Plan." The obvious connotation is that the employee will be given a chance to improve performance. Because Ms. Green took FMLA she was not given this opportunity; she was given only a week. This violated Magellan policy which states that an employee must be "given a reasonable period to improve performance." (Ex. O). A reasonable jury could conclude that, had Ms. Green not taken FMLA leave, she would have had a chance to improve her performance. And isn't one of the purposes of the Family and Medical Leave Act to allow an employee the chance to get healthy so they can perform up to their potential? In other words, if an employer cannot show that FMLA leave did not play a role in the termination, a violation has occurred. See e.g., 29 C.F.R. § 825.216(a).

One of the most critical pieces of evidence in the case is the testimony of Yagnesh Vadgama, the supervisor with ultimate decision-making authority, who testified that, had Ms. Green not taken leave and her performance improved, she would not have been terminated. (Vadgama Dep. 31:16-21). This was Vadgama's testimony despite his knowledge of the reasons given for the termination. This statement is direct evidence that Ms. Green's rights were interfered with when she was not given the same chance she would have received had she not taken FMLA.

In *Martin*, an employee survived summary judgment where his FMLA leave

prevented him from completing his improvement plan. *Martin* at 1267. The court found that while it was speculative that Martin would have completed the improvement plan, he should not have been denied that opportunity only because he was on FMLA. *Id*. The court recognized that, even though the reasons for the improvement plan were unrelated to the FMLA leave, his termination was related to the leave because he was not given a chance to improve his performance. *Id*. at 1268 (Kravitch, J., concurring).

This case is analogous to Martin. Like *Martin*, Ms. Green was not given the chance to improve her performance only because she took FMLA leave. In response, Magellan claims that after the leave began, they discovered reasons to terminate her immediately. Although the section on pretext, *infra*, will more fully address this issue, there are genuine issues of material fact surrounding Magellan's purported reasons. There is evidence of an effort by the supervisors to ensure that Ms. Green would not have a chance to return to her job and improve her performance. Moreover, not giving Ms. Green a reasonable period to improve violated policy. (Ex. O).

On August 14, the day before the performance improvement plan was issued, the supervisors have a conversation in which they are openly hostile to Ms. Green taking a half-day of FMLA leave. In response to Ms. Green taking leave, the supervisors remarked, "OMG," "Damn," and then expressed the hope that HR permits them to discipline Ms. Green as soon as possible. In another colloquy, Vadgama stated that Ms. Greed took FMLA to "play[] the system." A reasonable

jury could find that this is evidence of interference by taking steps to prohibit Ms. Green from being reinstated.

In *Diamond v. Hospice of Fla. Keys, Inc.*, the Eleventh Circuit found that a jury could conclude that, based on timing and context, a single statement in an email could be construed as interference. 677 Fed.Appx. 586, 593 (11th Cir. 2017). The *Diamond* court held that a single comment was enough to defeat summary judgment. Here, there is far more evidence of interference than what the *Diamond* court held was enough to defeat summary judgment.

Other evidence that points to interference, is the email that Cassidy sent to the Autism Team after Ms. Green's termination. (Ex. L). Cassidy's email suggests that Ms. Green was fired because the "team is fully staffed." If a replacement was hired during the FMLA leave, then Ms. Green had a right to be placed in another comparable job upon her return. A reasonable jury could determine that Cassidy's email casts doubt on the reasons Magellan claims Ms. Green was terminated.

Again, it is Magellan's burden of proof to show that Ms. Green was not entitled to reinstatement. Magellan has produced no evidence that any other employee was given only five days to show improvement after being issued a "Performance Improvement Plan." And a reasonable jury could find that a document that purports to be a performance improvement plan, requires that Magellan's policy be followed and an employee be given a meaningful opportunity to improve their performance.

A reasonable jury could find that the totality of the evidence proves that Magellan violated Ms. Green's right to reinstatement after her FMLA leave.

Because Magellan faces the added hurdle of the burden of proof on this issue, the denial of summary judgment is even more appropriate.

Since there are genuine issues of material fact about the failure to reinstate Ms. Green, summary judgment should be denied.

### ii.   There is a Plethora of Evidence That Magellan Retaliated

Unlike an interference claim where an employee need not show an ill intent or discriminatory motivation by the employer, a retaliation claim requires a plaintiff to establish that her employer intentionally discriminated, which the employee can establish through direct or circumstantial evidence. *Martin*, 543 F.3d at 1267. To state a prima facie case for retaliation, an employee must allege that:

(1) she engaged in a protected activity;
(2) she suffered an adverse employment decision; and
(3) the decision was causally related to the protected activity.

*Strickland*, 239 F.3d at 1207.

a.   <u>Ms. Green easily sets forth a prima facie case of retaliation.</u>

The first element asks whether Ms. Green engaged in a protected activity. The FMLA protects three types of activity, including an employee's exercise of rights provided under the FMLA. To engage in the exercise of FMLA rights, an employee must only invoke her FMLA rights. See *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004). Here, Ms. Green undeniably requested FMLA leave. The first prong is satisfied.

Since Ms. Green's employment was terminated, there is no question that she suffered an adverse employment action.

Finally, Ms. Green can easily satisfy the third prong, a causal connection. In *Martin*, the court held that close temporal proximity between FMLA leave and the adverse employment decision is "more than sufficient to create a genuine issue of material fact of causal connection." 543 F.3d at 1268. In *Diamond*, the court found that a jury could reasonably conclude that a two-week span between the return from FMLA leave and termination satisfied the causal connection. 677 Fed.Appx. at 595; see also, *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). Here the span is a few hours. (Ex. A ¶18).

The facts establish that Ms. Green has set forth a prima facie case of FMLA retaliation.

   b.   <u>Defendant's stated reason for termination was pretext for unlawful retaliation.</u>

If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action. *Hulbert* at 1297. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual. *Id.*

To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* at 1298.

Magellan claims that, during Ms. Green's FMLA leave, the supervisors discovered grounds for Ms. Green's termination. These reasons included the failure

to return voicemails, that an authorization was not completed from a fax because the fax was moved to a deleted folder, and that one turnaround time was possibly missed. As discussed in Section II, *supra*, for several reasons a reasonable jury could find the proffered basis for termination was pretextual, beyond the failure to follow Magellan policy. There is evidence that directly contradicts Magellan's claims about Ms. Green's performance during the week before the August FMLA leave began.

First, supervisor Cassidy stated that a voicemail that is not erased means it has not been returned. (Ex. A ¶ 11). A reasonable jury, using their experiences and common sense could find this claim to be irrational. Cassidy testified that she had members of the team, including Leslie Cotney, return the voicemails. (Cassidy Dep. 85:5-11). Cassidy testified that Cotney told her that Ms. Green had not returned any of the voicemails. (*Id.*). When pressed under cross-examination, Cassidy began to backtrack on her claims. (*Id.*). Moreover, Cotney has stated that Cassidy's claim about the phone calls is false. (Ex. B ¶ 5). And Cotney specifically asserts that she never told Cassidy that none of the voicemails had been returned by Ms. Green. (*Id.*). Moreover, Ms. Green has said that she did return her voicemails before beginning FMLA leave. (Ex. A ¶ 11). A reasonable jury could question the validity of Cassidy's claims related to the voicemails. And a jury could choose to disbelieve Cassidy's version of events and believe Ms. Green's.

Another reason Magellan claims that Plaintiff was terminated, was for not completing an authorization. Cassidy knew this because a fax was placed into a deleted folder within the email client. (Cassidy Dep. 116:21 – 118:13). These faxes,

however, were found in a general mailbox that was shared by the entire Autism Team. (*Id.*). Anybody with access could have placed those faxes in the deleted mailbox, including someone with a discriminatory motive to find a reason to terminate Ms. Green. (*Id.*). On the other hand, Ms. Green responds that she did not place a fax in a deleted folder. Further, Ms. Green had never placed faxes in a deleted folder in the past, making it even more unlikely. (Ex. A ¶ 12). A reasonable jury could decide that Ms. Green's explanation is more credible, especially when viewed alongside all the evidence in this case.

Another circumstance that a jury may find pretextual, is whether Ms. Green's email account could have been accessed by another employee. If this occurred, an individual could have tried to set up a pretext for termination within the email account, such as deleting faxes or emails. Cassidy testified that she had never sought to gain access to Ms. Green's email account. (Cassidy Dep. 47:5-13). Contrary to this assertion, the evidence shows that Cassidy sent an email requesting information on how to access Ms. Green's email account on September 3rd, just about a week after the leave began. (Ex. G). A reasonable jury could find Cassidy's disingenuous testimony about an issue that bears directly on the reasons proffered for Ms. Green's termination, to be evidence of possible pretext.

Also important is that, during the week between the performance improvement plan and the FMLA commencing, Ms. Green was assigned nearly three times the work she was given during an average week. And when Ms. Green requested help from supervisor Vadgama, he responded by assigning her more work.

A reasonable jury could find this was done as retaliation for Ms. Green's FMLA leave.

In *Hurlbert*, the court stated that "an employer's deviation from its own standard procedures may serve as evidence of pretext." 439 F.3d at 1299. Magellan's standard procedure states that, after a performance improvement plan has been issued, an employee must be "given a reasonable period to improve." (Ex. O). A jury could find that Magellan's deviation from procedure was evidence of pretext, especially in light of the short timeframe Ms. Green was given to improve: less than 5 days. A jury could believe that another aggravating factor was the amount of work Ms. Green was assigned during those 5 days and conclude there is evidence of pretext and retaliation.

In fact, on August 14th, the day before Ms. Green's supervisors gave her the "Performance Improvement Plan" and the day before she was saddled with three times her average workload, a text exchange between Cassidy and Vadgama exhibited direct evidence of hostility towards Plaintiff's FMLA leave. To briefly reiterate the exchange, Cassidy stated that Ms. Green would be taking a ½ day of FMLA leave. (Ex. D). The supervisors then wrote "OMG"[2] and "Damn." Vadgama then writes that he hopes "HR gets back to us ASAP." (*Id.*). The supervisors needed HR to approve discipline against Ms. Green. HR relied only on Vadgama's representations when deciding on whether to authorize discipline. A reasonable jury

---

[2] The "OMG" acronym is commonly used as an abbreviation for "Oh my God!"

could recognize the hostility to Ms. Green's FMLA leave exhibited by her supervisors in the text exchange. A jury could believe that Vadgama—the ultimate decision-maker on termination— expressing his desire to discipline Ms. Green during a conversation about her FMLA leave is strong evidence of discriminatory intent.

Additional evidence of discriminatory intent was illustrated on September 4th, just over a week after Ms. Green's August FMLA leave began. In a conversation with another employee, Vadgama wrote that "Jane played the system and went on FMLA…" (Ex. H). Here again, a reasonable jury could choose to believe that Vadgama's statements are evidence of discriminatory intent and, at the very least, open hostility to Ms. Green's FMLA leave.

On September 7th, Cassidy was notified that Ms. Green's leave had been approved; Cassidy emailed Vadgama to let him know. (Ex. I). On September 9, Vadgama's response to learning about the FMLA approval was, "Wow- this is a game changer right?" (*Id.*). While a reasonable jury may not think much of that comment standing alone, when viewed in the context of Vadgama's other comments about Plaintiff's leave, the jury could decide that Vadgama is pleased because he need not give Ms. Green an opportunity to improve her performance; instead, he can seek out a pretext to fire her and prevent her returning to work.

On the same day, it becomes clear that Vadgama directed Cassidy to search for a reason that Plaintiff can be fired immediately. (Ex. F). When Cassidy provides some reasons that Ms. Green could be terminated, Vadgama responds:

"Fantastic work, Jen. Truly. We have grounds for termination.

Now just need to sort through this FMLA situation."

(*Id*.). A reasonable jury could decide that Vadgama's statements are abnormal and evince an intent to discriminate. For instance, based on Vadgama's response to Cassidy, a jury could easily decide that Vadgama directed Cassidy to find any reason to terminate Ms. Green. Or a jury could believe that Vadgama's statement that the "FMLA situation" needs to be "sorted through" so that Plaintiff could be terminated, is evidence of hostility towards FMLA, especially when viewed in the context of Vadgama's other discriminatory remarks.

Finally, going back to Ms. Green's first request for FMLA leave due to her husband's terminal illness, the evidence shows that Cassidy manually kept track of the time Ms. Green took time off to care for her husband on a physical calendar. (Cassidy Dep. 80:4-14; 121:22 – 122:9). This was done in violation of Magellan policy. (Zampogna-30(b)(6) Dep. 20:9-12). While Cassidy decided on her own to classify these days off as FMLA leave, Ms. Green never asked that it be qualified as FMLA; instead, she used PTO time that she had accrued. When Ms. Green began the August FMLA leave for her own medical condition, Cassidy contacted HR and took affirmative steps to have Ms. Green's entitlement to FMLA reduced. (Ex. N). HR then contacted the plan administrator and tried to have the FMLA entitlement reduced. (Steele Dep. 11:11-21). Although Cassidy and the HR representative, Kazia Steele, did not succeed in reducing her leave, this is more evidence of the hostility and discriminatory animus that was focused towards Ms. Green's FMLA leave.

Courts have found that close temporal proximity between the FMLA leave and the adverse employment action is evidence of pretext. *Hurlbert*, 439 F.3d at 1298. Ms. Green was terminated a few hours after returning to work from her leave. (Ex. A ¶ 18).

In *Hurlbert*, the court recognized that an employer providing inconsistent reasons for an employee's termination may serve as evidence of pretext. 439 F.3d at 1298. The day of Ms. Green's termination, Cassidy sent an email to her staff intimating that Ms. Green was fired because the "team is fully staffed." (Ex. L). A jury could decide that Cassidy's email to the staff contradicts the proffered reason for Plaintiff's discharge and is evidence of pretext.

When viewed in its totality, there is strong evidence that the reasons proffered for Plaintiff's termination are pretextual. Even if the Court does not find that there is definitive evidence of discriminatory intent, there is more than enough evidence for a reasonable jury to conclude that Magellan's proffered reasons for termination were a pretext for discrimination. Plaintiff should be permitted to present these facts and evidence; and a reasonable jury could decide that her version of events is more credible than Magellan's.

### C.   EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA) – 29 U.S.C. § 1001 *et seq.*

Under ERISA § 510[3], creates a cause of action for the interference or retaliation with an employee's ERISA benefits. Magellan's Benefit Guide states that

---

[3] ERISA § 510 is also codified at 29 U.S.C. § 1140.

the short-term disability plan is subject to ERISA's safeguards. (Ex. M).

i.   **Magellan's HR Department Interfered with Plaintiff's ERISA Benefits.**

ERISA § 510  prohibits adverse employment actions that are taken to interfere with plan participants' and beneficiaries' earned or promised benefits.

To state a claim, a plaintiff must establish that employers intended to interfere with their rights under a benefit plan, such as a disability plan. *Echols v. BellSouth Telecomms., Inc.*, 385 Fed.Appx. 959, 962 (11th Cir. 2010).

Magellan argues that because Kazia Steele— the HR rep who called Ms. Green and threatened her termination for job abandonment— was not a decision-maker as to Plaintiff's termination, the claim cannot survive. (Ex. A ¶¶ 14-15).

The interference, however, was more subtle and manipulative. And interference can take forms beyond an adverse employment action. When Steele called Ms. Green on November 15, 2019 and ordered her back to work, Ms. Green specifically asked about her short-term disability ("STD"). (*Id.;* Ex. J). Steele replied only that she would be terminated if she did not appear for work. (*Id.*). When Steele made this statement, she knew that (1) Ms. Green was qualified for STD until the latter part of November (and that Ms. Green's medical provider may request additional leave); and (2) that Ms. Green was going to immediately be terminated on her return to work. (Exs. R, J). As a result, Steele's statements about termination for job abandonment were a pretense to lure Ms. Green back to work for a few hours so she could be immediately terminated and would no longer be eligible for STD.

Magellan's policies state that an employee will remain on the payroll while STD is ongoing, but Steele failed to provide this information when Ms. Green requested it. (Ex. A ¶ 15). Based on Steele's representation, Ms. Green asked her medical provider to release her to return to work so she would not lose her job. (Ex. A ¶ 16; Ex. C ¶¶ 4-6). Plaintiff's medical provider testified that, while she believed Ms. Green should use the rest of her STD before returning to work, she believed the "psychological consequences of losing her job would cause more harm." (*Id.*).

A reasonable jury could infer that Steele's comments to Plaintiff, made with the knowledge that Ms. Green would forfeit her ERISA benefits needlessly, was a direct attempt to interfere with her vested benefits. Further, the fact that Steele knew that Ms. Green would be immediately terminated, means that she misled Plaintiff in a way that would guarantee that she would lose her remaining benefits. A jury could also infer from these facts that Magellan, through its HR representatives, took affirmative steps to prevent employees from using the full entitlements of their ERISA benefits after FMLA expired. This can also be inferred from the fact that Steele failed to notify Plaintiff about the effect returning to work would have on her STD, even after Ms. Green asked Steele specifically about her STD benefits.

A jury should be presented with these facts and have a chance to decide whether Magellan and Steele interfered with Ms. Green's rights under the ERISA qualified benefit plan.

## CONCLUSION

Based on the evidence and argument above, there are genuine issues of material fact that preclude summary judgment. Defendant's Motion should be denied.

This 16th day of May, 2022.

HENEFELD & GREEN, P.C.

/s/ Noah Green
Noah Green
Georgia Bar No. 468138
*Attorney for Plaintiff*

3017 Bolling Way NE, Suite 129
Atlanta, Georgia 30305
(404) 841-1275
ngreen@henefeldgreen.com

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.1(D), I certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in 13-point Century Schoolbook typeface.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JANE S. GREEN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | CIVIL ACTION NO. |
| | § | 1:20-cv-05016-SCJ-LTW |
| **MAGELLAN HEALTH, INC.** | § | |
| | § | |
| *Defendant.* | § | |

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and accurate copy of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, Plaintiff's Response to Defendant's Statement of Material Facts and Plaintiff's Additional Statement of Facts, and Exhibits A through R, by electronically filing the documents using the Court's CM/ECF System, which will automatically serve all counsel of record.

This 16th day of May, 2022.

HENEFELD & GREEN, P.C.

/s/ Noah Green
Noah Green
Georgia Bar No. 468138
*Attorney for Plaintiff*

3017 Bolling Way NE, Suite 129
Atlanta, Georgia 30305
(404) 841-1275
ngreen@henefeldgreen.com